UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JESSE BRUMBAUGH, et al.,

      Plaintiffs,

                         Case No. 1:25-cv-269

      v.

                         JUDGE DOUGLAS R. COLE

BARRETT SINGLETON, et al.,

      Defendants.

## OPINION AND ORDER

Plaintiffs Jesse Brumbaugh and Jennifer Foster, husband and wife, bought a home from Defendants Barrett and Claire Singleton, also husband and wife, in 2021. That home, however, turned out to contain lead-based paint hazards, which allegedly caused elevated levels of lead in Plaintiffs' young children. So Plaintiffs sued, on behalf of themselves and their minor children, over alleged failures to adequately disclose those lead-based paint hazards. Defendants now move to partially dismiss Plaintiffs' claims. (Doc. 10). For the reasons discussed below, the Court **GRANTS** Defendants' Partial Motion to Dismiss (Doc. 10).

## BACKGROUND[1]

The facts of this case are relatively straightforward. Defendants Claire and Barrett Singleton previously owned a home at 4057 Beechwood Avenue, Cincinnati,

---

[1] Because this matter is before the Court on Defendants' motion to dismiss, the Court must accept the well-pleaded allegations in the Complaint as true. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). So while the Court relies on the Complaint's allegations to recount the case's background, it reminds the reader that they are just that—allegations.

Ohio (the Property). (Compl., Doc. 1, #3). The Singletons originally purchased the Property on October 23, 2017. (*Id.* at #4). A year and a half later, Cincinnati's health department sent them an "Order to Control Lead Hazards." (*Id.* at #4, 18–20 (Ex. A, Order)). That order stated that the "Cincinnati Health Department conducted a public health lead risk assessment … [and] Lead Hazards were found which contributed, in whole or in part, to a child's lead poisoning." (*Id.* at #18). The order went on to note a variety of lead-based paint hazards on both the home's exterior and interior. (*Id.* at #18–19). Additionally, the order required the Singletons to obtain a clearance examination from an Ohio-licensed lead risk assessor and to submit that examination to the health department in order to obtain a Notice of Compliance. (*Id.*).

The Singletons did so, and on February 11, 2020, the health department sent the Singletons that notice, thereby lifting the previous order and attaching the clearance examination report. (*Id.* at #63 (Ex. B, Notice)). Specifically, "[t]he clearance examination was performed on 02/11/2020, and the results indicate that the lead hazards identified in the lead hazard control order have been sufficiently controlled." (*Id.*).

A little over a year later, on April 27, 2021, the Singletons sold the Property to Plaintiffs Jesse Brumbaugh and Jennifer Foster (collectively the Buyers). (*Id.* at #2–3, 5, 73–80 (Ex. C, Purchase Contract)). As part of the Purchase Contract, the Buyers specifically agreed that they were buying the Property "As Is with Inspections." (*Id.* at #77). As the Purchase Contract explained, that meant that the Buyers had the

right to conduct inspections, and then "either accept the home as is or terminate the contract." (*Id.*).

Beyond that, before the parties signed on the dotted line, the Singletons provided a Lead-Based Paint Disclosure Form to the Buyers, which the Buyers signed. (*Id.* at #6, 82 (Ex. D, Disclosure Form)). This disclosure form lies at the heart of this dispute, so the Court highlights its key components. First, the form includes a generic "Lead Warning Statement" that, among other things, states "[t]he seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards." (*Id.* at #82). Regardless, it advised that "[a] risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase." (*Id.*).

Second, specific to the present purchase, the Singletons checked a box stating that "[k]nown lead-based paint and/or lead-based paint hazards are present in the hous[e]," explaining that "[t]his home participated in the Ohio Lead Abatement Tax Program [and] [a]ll friction surfaces have been cleared by [the] Cincinnati Health Dept." (*Id.*). They, however, also checked a box that they "ha[ve] no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the hous[e]." (*Id.*).

Last, the Buyers initialed an acknowledgment and checked a box indicating that they "[w]aived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint." (*Id.*).

In the process of selling the home, the Singletons also provided the Buyers a "Work History" that detailed all renovations to the home. (*Id.* at #7, 84 (Ex. E, Work History)). That history did not note any lead-specific work. The Buyers allege the above-described disclosure form and work history were the only documents they received regarding any lead-related hazards. (*Id.* at #7).

The parties officially closed on August 3, 2021, where the Singletons executed a general warranty deed. (*Id.* at #8).

But then the concerns began. On March 4, 2022, the Buyers had their first child, B.B. (*Id.* at #8). Four months later, B.B.'s blood test showed elevated levels of lead. (*Id.*). At that point, the Buyers understandably took steps to remove lead from their home, including moving out of their home and "engag[ing a] certified lead abatement contractor to remediate the lead-based paint on the radiators and two doors in the home." (*Id.*).

But the problems continued. On September 8, 2023, Brumbaugh and Foster had a second child, R.B. (*Id.* at #9). A year later, on September 14, 2024, R.B.'s blood test showed elevated levels of lead. (*Id.*). The Buyers once again moved out of their home and initiated a more thorough lead investigation. (*Id.*). To start, they reached out to Cincinnati's Childhood Lead Poisoning Prevention Program, who sent a lead risk inspector for an "unofficial visit" to the Property. (*Id.*). That inspector informed the Buyers of the previous Order to Control Lead Hazards due to a child's lead poisoning. (*Id.*). After that, in spring 2025, they hired a lead risk assessor to assess the Property. (*Id.* at #9, 86–112 (Ex. F, Lead Risk Assessment Report)). That report

"revealed significant additional amounts of lead-based hazards that have not been remediated and will cost hundreds of thousands of dollars to abate." (*Id.* at #9).

With that, the Buyers decided to seek recourse from the Singletons. On April 25, 2025, they sued the Singletons for failing to fully disclose the Property's lead hazards. (*See generally* Doc. 1). They brought the lawsuit on behalf of themselves individually but also on behalf of their two minor children. (*Id.* at #1). Specifically, they assert five causes of action: (1) a violation of the federal Residential Lead-Based Paint Hazard Reduction Act (RLPHRA), (2) a violation of the federal Toxic Substances Control Act (TSCA), 15 U.S.C. § 2601 et seq., (3) fraudulent misrepresentation under Ohio common law, (4) breach of contract under Ohio common law, and (5) declaratory judgment. (*Id.* at #10–14).

On June 27, 2025, the Singletons moved to partially dismiss. (Doc. 10). First, they seek to dismiss any claims brought on behalf of the Buyers' minor children because the children lack standing, cannot meet the elements for fraud, and at least for B.B., the claims are time-barred. (*Id.* at #352–56). Second, the Singletons argue the Buyers fail to state a claim for the TSCA claim, fraudulent misrepresentation claim, breach of contract claim, and request for declaratory judgment. (*Id.* at #356–64). They do not seek dismissal of the RLPHRA claim.

The Buyers responded, (Doc. 11), and the Singletons replied, (Doc. 12). So the matter is ripe for the Court's review.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege "sufficient factual matter … to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). While a "plausible" claim for relief does not require a showing of probable liability, it requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* The complaint must allege sufficient facts to allow the Court "to draw the reasonable inference that the defendant is liable." *Id.*

"In reviewing a motion to dismiss, [the Court] construe[s] the complaint in the light most favorable to the plaintiff, draw[s] all reasonable inferences in their favor, and accept[s] all well-pleaded allegations in the complaint as true." *Keene Grp. Inc. v. City of Cincinnati*, 998 F.3d 306, 310 (6th Cir. 2021). But that does not mean the Court must take everything a plaintiff alleges at face value, no matter how unsupported. The Court may disregard "naked assertions" of fact, "formulaic recitations of the elements of a cause of action," and "mere conclusory statements." *Iqbal*, 556 U.S. at 678 (cleaned up). Additionally, the Court may grant a motion to dismiss "on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989) (citations omitted).

## LAW AND ANALYSIS

Defendants move to dismiss all of the Buyers' claims except for the RLPHRA claim. (Doc. 10). The Court starts with the Singletons' arguments regarding the minor children's standing before moving to the merits of the claims. Ultimately, though, the Court grants Defendants' Partial Motion to Dismiss (Doc. 10) in its entirety.

## A.    Minor Children

The Singletons first move to dismiss essentially all claims to the extent they are brought on behalf of the Buyers' minor children. (Doc. 10, #352–56). This includes a standing argument for several of the claims. As standing can have jurisdictional overtones, the Court starts there. It then addresses the Singletons' arguments regarding the substance of the fraud claim and general statute-of-limitations arguments. The Court addresses the declaratory judgment action in a later section though. *See* infra Law & Analysis, Part E.

### 1.    Standing

In general, "[a]n action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a)(1). A guardian, however, is permitted to "sue in their own names without joining the person for whose benefit the action is brought." Fed. R. Civ. P. 17(a)(1)(C). In other words, a parent may sue on behalf of their child without that child being a party to the lawsuit. The rule does not provide a get-out-of-standing-free card though. The parent-plaintiff must still satisfy the normal Article III and prudential standing requirements. *See Ferrarini v. Cleveland Metro. Sch. Dist.*, No. 1:24-cv-1373, 2025 WL 1291829, at *2 (N.D. Ohio May 5, 2025).

Here, the Singletons argue that the children lack standing for the RLPHRA, breach of contract, and declaratory judgment claims. (Doc. 10, #352–56). The Buyers respond, though, that the question is not whether their children have standing on their own; it is whether the parent-plaintiff has standing. (Doc. 11, #376–77). And on that front, the Buyers highlight that the Singletons have not argued the parents lack

7

standing. (*Id.* at #377). To that, the Singletons reply that "Plaintiffs confuse the issue of statutory standing [with] constitutional or prudential standing." (Doc. 12, #387). They argue that statutory standing is a failure-to-state-a-claim question, not a subject-matter jurisdiction issue. (*Id.*).

### a.  RLPHRA claim

The Court starts with the RLPHRA claim. The Sixth Circuit addressed this exact question, whether children have standing under the RLPHRA, in *Roberts v. Hamer*, 655 F.3d 578 (6th Cir. 2011). First, the Sixth Circuit addressed the confusion around statutory standing as compared to constitutional and prudential standing. *Id.* at 580–81. It noted that, unlike Article III and prudential standing, which go to the Court's subject-matter jurisdiction, statutory standing is more akin to a merits question. *Id.* at 580–81. Statutory standing merely asks "whether *this* plaintiff has a cause of action under the statute." *Id.* at 580 (emphasis in original) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 97 n.2 (1998)). So "[w]here a plaintiff lacks statutory standing to sue, her claim should be dismissed for failure to state a claim upon which relief can be granted, not for lack of subject-matter jurisdiction." *Id.* at 581 (collecting cases). As for the RLPHRA specifically, Congress created a private cause of action as follows: "'Any person who knowingly violates the provisions of [RLPHRA] shall be jointly and severally liable to the *purchaser or lessee* in an amount equal to 3 times the amount of damages incurred by such individual." *Id.* at 582 (emphasis added) (quoting 42 U.S.C. § 4852d(b)(3)).

8

In *Roberts*, the mother-plaintiff argued that her children were "de facto lessees," so they could sue under the statute. *Id.* The court rejected that argument. *Id.* at 583. It found that "'[w]here a statute names the parties granted the right to invoke its provisions, such parties only may act.'" *Id.* (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6–7 (2000)). The language of the statute expressly identifies "purchaser[s] or lessee[s]," which clearly do not include minor children. *Id.* Various courts around the country have held the same. *Id.* at 584 (collecting cases).

The Buyers do not contest this. (Doc. 11, #377). Rather "for the purpose of preserving the argument for appeal, Plaintiffs respectfully state the *Roberts* holding is inconsistent with the text, purpose, and legislative history of the RLPHRA." (*Id.* (citing first *Cudjoe ex rel. Cudjoe v. Dep't of Veterans Aff.*, 426 F.3d 241, 250 (3d Cir. 2005); and then *McCormick v. Kissel*, 458 F. Supp. 2d 944, 947–48 (S.D. Ind. 2006)). But both cases they cite turned on how those circuits "have held that a person without express statutory standing may still have standing to sue if the person meets the minimum requirements for Article III standing as well as the additional elements of prudential standing." *Cudjoe*, 426 F.3d at 250 (citation omitted); *see McCormick*, 458 F. Supp. 2d at 947. The Sixth Circuit, which controls here, did not adopt that approach; it instead followed the statute's plain language. *Roberts*, 655 F.3d at 583. Given *Roberts*, the Court finds that their minor children do not have statutory standing, so the Court dismisses the RLPHRA claim, to the extent it is brought on their behalf, with prejudice.

### b. Breach of Contract

The Singletons also challenge the children's standing for the breach of contract claim. (Doc. 10, #354–55). The Buyers do not specifically respond to this beyond their general arguments that the parent's standing is all that matters. (Doc. 11, #376–77).

For breach of contract claims, "[o]nly a party to a contract or an intended third-party beneficiary of a contract may bring an action on a contract in Ohio." *Grant Thornton v. Windsor House, Inc.*, 566 N.E.2d 1220, 1223 (Ohio 1991) (citing *Visintine & Co. v. New York, Chicago, & St. Louis R.R. Co.*, 160 N.E.2d 311, 313 (Ohio 1959)). While the Court is not certain that "standing" is the correct label to apply to this limitation, it is nonetheless a settled limitation on who can serve as a plaintiff in a breach of contract action. Here, the Buyers' minor children, by virtue of being minors, are clearly not parties to the contract. So the only way they could sue is if they are intended third-party beneficiaries. On that issue, a court considers "if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and … the circumstances indicate that the promise intends to give the beneficiary the benefit of the promised performance." *Huff v. FirstEnergy Corp.*, 957 N.E.2d 3, 6 (Ohio 2011) (quoting Restatement (Second) of Contracts § 302(1)(b) (1981)). To determine the contract's intent, the court looks to the language of the contract, unless it is unclear or ambiguous. *Id.* at 7.

The Court concludes that the Buyers' minor children could not have been intended beneficiaries of the contract for the simple reason that the Singletons highlight: the children were not even born at the time of the contract. (*See* Doc. 10, #355). The parties signed the Purchase Contract on April 27, 2021. (Doc. 1, #5, 80).

10

And they proceeded to closing on August 3, 2021. (*Id.* at #8). Yet Plaintiffs' first child was not born until March 4, 2022. (*Id.*). And there is no language in the Purchase Contract indicating an intent to benefit future, as-yet-unborn children. So the children cannot advance a claim for breach of that contract. As a result, the Court dismisses the claim with prejudice only with respect to them.

### 2.      Fraudulent Misrepresentation

Next, the Singletons make a similar argument, although not phrased in terms of standing, that the Buyers' minor children cannot establish the elements for a fraudulent misrepresentation claim. (Doc. 10, #354). Again, the Buyers barely respond to this argument beyond stating that "Defendants' focus on whether B.B. and R.B. … relied on the Defendants' misrepresentations is misguided" because the parents have standing. (Doc. 11, #377).

And once again, this claim fails because the children were not born at the time the misrepresentations and/or omissions were allegedly made. Because of that, the Singletons "could not have made any representations to or concealed any information from [the] unborn Minor Children [and the] unborn Minor Children could not have justifiably relied on the same." (Doc. 10, #354). So the Court dismisses this claim with prejudice as well with respect to the Buyers' children.

### 3.      Statute of Limitations

The Court declines to address the statute-of-limitations argument because it already dismisses the RLPHRA, breach of contract, and fraudulent misrepresentation claims with prejudice. While that leaves the TSCA and declaratory

11

judgment claims, the Court dismisses those on other grounds in a moment, rendering the statute-of-limitations issue moot.

## B. Toxic Substances Control Act

Turn now to the Plaintiffs' claim under the TSCA, which the Court addresses as to both the parents and the children. The Singletons argue that there is no private right of action for money damages under the TSCA, and injunctive relief is not relevant here. (Doc. 10, #356–57). Plaintiffs have a different view. They argue that the disclosure regulations applicable to the TSCA and the RLPHRA overlap so that failure to comply with the disclosure regulations violates both the RLPHRA and the TSCA. (Doc. 11, #378 (citing 40 C.F.R. § 745.118(e) (providing that "[f]ailure … to comply with [the disclosure regulations] is a violation of [RLPHRA] and of TSCA section 409"))). The same regulatory enforcement provision, 40 C.F.R. § 745.118, also includes a provision for monetary damages, which is virtually identical to that in the RLPHRA. *Compare* 40 C.F.R. § 745.118(c) *with* 42 U.S.C. § 4852d(b)(3). From that, the Buyers claim that the "TSCA regulations plainly set forth a private claim for monetary damages." (Doc. 11, #378). Here, Plaintiffs only seek money damages, (*see id.* at #11 (requesting treble damages for each violation)), so if there is no private cause of action, the Court must dismiss the claim.

The Court concludes there is no private cause of action under the statute. The statute permits civil actions "to restrain … violation[s]" of the TSCA, 15 U.S.C. § 2619, which has been interpreted to include only injunctive relief. *See Huang v. Phan*, No. 21-2040, 2022 WL 2752218, at *2 (3d Cir. July 14, 2022) (citation omitted)

12

("[T]he TSCA permits private citizens to sue for injunctive relief to restrain violations, but it does not permit them to sue for money damages."); *Cudjoe*, 426 F.3d at 248 n.5 (citations omitted) ("The only citizens' suits allowed under 15 U.S.C. § 2619 are to enjoin violations of the [TSCA], not for money damages. Courts have held that the [TSCA] does not permit private citizens to pursue either civil penalties available under the statute … or compensation for personal injuries.").

While the Sixth Circuit has not addressed the issue as of yet, another district court in this circuit specifically found there was no implied cause of action under the regulations implementing the TSCA either. *Crawford v. Midwest Training Servs., LLC*, No. 1:14-cv-425, 2015 U.S. Dist. LEXIS 72183, at *2–3 (W.D. Mich. June 4, 2015). The court in *Crawford* first noted that the TSCA only grants the EPA authority to issue regulations under the TSCA, and otherwise generally "provides that violations of the law are prohibited." *Id.* On top of that, "the statute does explicitly provide for a private right of action for other types of violations that are not at issue in this case," namely, violations of the RLPHRA. *Id.* (citations omitted). From that, the court inferred that Congress did not intend to create a private cause of action. *Id.* And to the extent that the TSCA regulations could be read as creating such a right, that doesn't work either. *Id.* (citing *Johnson v. City of Detroit*, 446 F.3d 614, 625 (6th Cir. 2006)) (noting that federal regulations cannot independently create a private right of action).

The Court finds that reasoning persuasive and likewise concludes that there is no private cause of action under the TSCA. To the extent that the Buyers assert

that a violation of the TSCA regulations also violates the RLPHRA, then their path to recovery here lies under the latter statute. And the Singletons have not moved to dismiss that claim. Accordingly, the Court dismisses this TSCA claim with prejudice.

## C.     Fraudulent Misrepresentation

The parties most heavily contest whether the fraudulent misrepresentation claim can proceed. To state a claim for fraudulent misrepresentation in Ohio, Plaintiffs must establish "(1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance." *Ford v. New Century Mortg. Corp.*, 797 F. Supp. 2d 862, 873 (N.D. Ohio 2011) (citation omitted).

The Buyers' Complaint points to several alleged misrepresentations and concealments, primarily based on the Lead-Based Paint Disclosure Form. First, while the Singletons checked the box disclosing that there are known lead paint-based hazards, they also checked the box that they "ha[ve] no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the hous[e]." (Doc. 1, #82). The Buyers argue this was a knowing misrepresentation because the Singletons had received the Order, its related lead assessment, and the eventual Notice of Compliance from Cincinnati's health department. (*Id.* at #6). Under their theory, all

14

these would constitute "records" of lead-based paint hazards. Second, they point to the disclosure form stating that the "home participated in the Ohio Lead Abatement Tax Program." (*Id.* at #82). While that was true as far as it went, the Buyers argue the Singletons omitted that the home also participated in the Childhood Lead Poisoning Prevention Program. (*Id.* at #6). Third, the Buyers point to the Singletons' statement (in the disclosure form) that "[a]ll friction surfaces have been cleared by [the] Cincinnati Health Dept." (*Id.* at #82). The Buyers claim this was a two-part misrepresentation. The underlying report states that the inspector "did not get access to the basement because [the Singletons] do not use the basement," yet the Singletons regularly used the basement as a "laundry area, workshop, and the sole entrance into the home through the garage." (*Id.* at #6). So the Buyers allege the Singletons misrepresented the Property to the inspector "in order to obtain the Notice of Compliance." (*Id.* at #6–7). And because the original lead assessor did not access the basement, any necessary abatement work in that space could not have occurred. (*Id.* at #6). That leads to the second part of the misrepresentation—claiming in the disclosure form that *all* friction surfaces were cleared, even though the basement was not. (*Id.* at #6–7). Beyond the disclosure form, the Buyers argue that the work history document was underinclusive because it omitted any work related to clearing the lead-based hazards. (*Id.* at #7).

In the motion to dismiss here, the Singletons argue that (1) caveat emptor bars the claim, (2) the Buyers cannot have justifiably relied on the alleged misrepresentations as a matter of law because they knew of the potential defect, and

15

(3) the Buyers expressly purchased the property "as is with inspections." (Doc. 10, #357–63). The Buyers, naturally, dispute that caveat emptor and "as is" provisions bar their fraud claim; rather, fraud is a known exception to both doctrines. (Doc. 11, #381–83). As for justifiable reliance, they maintain that it is a question of fact, so it is not appropriate to decide it at the motion to dismiss stage. (*Id.* at #381–82).

The Court analyzes the caveat emptor and "as is" provision arguments together and ends its analysis there. For caveat emptor, the Ohio Supreme Court described its principles as follows:

> Since problems of varying degree are to be found in most dwellings and buildings, the doctrine performs a function in the real estate marketplace. Without the doctrine nearly every sale would invite litigation instituted by a disappointed buyer. Accordingly, we are not disposed to abolish the doctrine of *caveat emptor*. A seller of realty is not obligated to reveal all that he or she knows. A duty falls upon the purchaser to make inquiry and examination.

*Layman v. Binns*, 519 N.E.2d 642, 644 (Ohio 1998). But caveat emptor's exception to disclosure requirements is not limitless. In particular, Ohio courts have imposed three conditions upon its operation: "(1) the defect must be open to observation or discoverable on reasonable inspection, (2) the purchaser must have an unimpeded opportunity to examine the property[,] and (3) the vendor may not engage in fraud." *Id.*

Similarly, an "as is" clause in the purchase agreement also means a seller does not have a duty to disclose defects. *Dito v. Wozniak*, 2005-Ohio-7, ¶ 12 (9th Dist.) But "an 'as is' clause does not protect a seller who positively misrepresents or conceals the complained of condition." *Hubbard Family Trust v. TNT Land Holdings, LLC*, 9

N.E.3d 411, 420 (Ohio Ct. App. 2014) (citing *Eiland v. Coldwell Banker Hunter Realty*, 702 N.E.2d 116, 123 (Ohio Ct. App. 1997)).

Here, it is clear that the Buyers cannot rely on either of the first conditions that act as limitations on caveat emptor. To start, the Singletons argue that the lead paint hazards at issue here were open to observation or could have been discovered during a reasonable investigation, (Doc. 10, #359), and the Buyers do not seem to dispute this. The Court agrees. Turning to the second condition, the Buyers likewise cannot dispute that they had an opportunity to inspect the property. The Purchase Contract expressly granted the Buyers the right "to conduct inspection(s) of the real estate"; indeed, their obligation to purchase was contingent upon the results of the inspection. (Doc. 1, #76). On top of that, the Buyers specifically waived any lead-based paint inspection in both the purchase contract and in the lead disclosure form. (*Id.* at #76, 82). So, while they may not have availed themselves of the opportunity to examine the property, they clearly had it.

That leaves the third exception—that the sellers engaged in fraud. In other words, the question is whether the Buyers have plausibly alleged that the Singletons committed fraud. The Court first notes that not every misrepresentation constitutes fraud. "[A] buyer of real property has 'no just cause for complaint even though there are misstatements and misrepresentations by the [seller] not so reprehensible in nature as to constitute fraud.'" *Dito*, 2005-Ohio-7, ¶ 12 (9th Dist.) (quoting *Traverse v. Long*, 135 N.E.2d 256, 259 (1956)). As for fraud by omission, a seller must disclose material facts only when there is a duty to speak. *Layman*, 519 N.E.2d at 644. And

17

even then a seller only "has a duty to disclose material facts which are latent, not readily observable or discoverable through a purchaser's reasonable inspection." *Id.* (citations omitted). So if the defect is not latent, as is the case here, then the seller does not commit fraud by failing to disclose it. *Id.* at 645. Thus, to defeat caveat emptor, "the purchasers must show an affirmative misrepresentation or a misstatement of material fact." *Id.*

Moreover, if the seller provides notice of some defect, "the buyer has a duty to either (1) make further inquiry of the owner, or (2) seek the advice of someone with sufficient knowledge to appraise the defect." *Dito*, 2005-Ohio-7, ¶ 19 (quotation omitted). Regardless of whether the buyer in fact conducts an inspection, "[w]hen the buyer has had the opportunity to inspect the property, … he is charged with knowledge of the conditions that a reasonable inspection would have disclosed." *Hubbard Family Trust*, 9 N.E.3d at 421. (citations omitted). And, of course, a buyer cannot claim fraud based on information as to which the buyer is deemed to have knowledge.

Under that analytical framework, this case presents a close call. On the one hand, it appears the Singletons may have (1) actively misrepresented that they had any records or reports relating to lead-related hazards, (2) failed to disclose they participated in the Childhood Lead Poisoning Prevention Program, and (3) appear to have misled both the health department and the Buyers about whether they had in fact cleared *all* of the contaminated surfaces. All of that seems like material information that could have affected the Buyers' decision to purchase the house, or

18

at minimum, the price they would have been willing to pay. In other words, while the Singletons technically disclosed that they *knew* of lead-based paint hazards in the home, they did not fully disclose the information surrounding that, and the "rules of common sense" indicate this may not have been accidental. *Dito*, 2005-Ohio-7, ¶ 19 (quotation omitted). Disclosure that a child has suffered lead poisoning while living in a house is simply different in kind than disclosing participation in an abatement tax credit program, and it is at least plausible (this is a motion to dismiss after all) that the Singletons knew that the one would be more troubling than the other.

Despite those concerns, however, a "disclosure form is not a substitute for a buyer's inspection." *Kramer v. Raterman*, 830 N.E.2d 416, 420 (Ohio Ct. App. 2005). And, as intimated above, "[w]hen a plaintiff claiming fraud in the sale of property has had the opportunity to inspect the property, he is charged with knowledge of the conditions that a reasonable inspection would have disclosed." *Id.* The court in *Kramer* explained in great detail how "even when structural defects are described in less severe terms than what is actually true, notice to the buyer of the defect precludes claims of fraud and misrepresentation." *Id.* at 420–22 (collecting cases).

At the end of the day, the Singletons did check the box indicating that there were known lead-based paint hazards in the home. (Doc. 1, #82). This served to alert the Buyers of the need to inquire further or hire someone with relevant expertise. *Dito*, 2005-Ohio-7, ¶ 19. Instead, the Buyers elected to waive the lead-related inspection. (Doc. 1, #76, 82). And the Buyers have not alleged any facts suggesting that the Singletons took steps to conceal the lead-based paint hazards so that they

19

would not be observable in an inspection. So the Court must find that caveat emptor, and alternatively the "as is" clause in the Purchase Contract, bar the Buyers' fraudulent misrepresentation claim. Because caveat emptor is dispositive, the Court does not evaluate the other arguments. But, as the Buyers could conceivably address this defect through additional allegations, the Court dismisses this claim without prejudice.

### D.      Breach of Contract

The Singletons also move to dismiss Plaintiffs' breach of contract claim because it "is substantively identical to their fraud claim." (Doc. 10, #363–64). So they merely provide a paragraph reiterating that they disclosed the lead-related hazards and that the Buyers waived the inspection. (*Id.*). The Buyers likewise incorporate their arguments in support of their fraud claim in response to the Singletons' efforts to dismiss their breach of contract claim. (Doc. 11, #383).

To start, the Singletons are correct that the Buyers base their breach of contract claim on their fraud allegations. (*See* Doc. 1, #13). Specifically, the Buyers allege that the disclosure form was incorporated by reference into the Purchase Contract, and that the Buyers satisfied their contractual obligations under that contract by paying the purchase price. (*Id.*). But they argue that the Singletons breached "[b]y knowingly and intentionally misrepresenting material statements about the Property" in the disclosure form. (*Id.*). So the question is whether this factual overlap, coupled with the fact that the Court dismisses the fraud count, *see* Part C, requires that the Court dismiss this claim as well.

20

The Court concludes the answer to that question is yes. The breach of contract claim here is duplicative of the fraud claim, so caveat emptor also bars recovery under this claim. The Buyers do not allege any other provision of the contract or any other contractual duty (i.e., a provision not subsumed by their fraud allegations) to support the breach claim. Indeed, *both* parties in their briefing for the breach of contract claim stood by their arguments regarding the fraudulent misrepresentation claim. So the Court will stand by its analysis, as well. Thus, the Court dismisses the breach of contract claim, too.

### E.    Declaratory Judgment

The Singletons likewise argue that the declaratory judgment claim seeks the same relief as the other, substantive claims and should be dismissed on that ground. (Doc. 10, #364). The Buyers, however, argue a declaratory judgment would "promote 'efficiency' and 'fairness' while posing no problems for 'federalism.'" (Doc. 11, #383 (citing *Western World Ins. Co. v. Hoey*, 773 F.3d 755, 760 (6th Cir. 2014))). But *Western World*, the case on which the Buyers rely for this argument, involved a debate over which of two courts should hear the declaratory judgment action based on the *Grand Trunk* factors, not whether a declaratory judgment claim was duplicative of substantive claims in the same action. 773 F.3d at 760. So that case does not help them.

In terms of the specific declaratory relief at issue here, Plaintiffs "seek a declaration that Defendant[s] ha[ve] violated the RLPHRA, violated the TSCA, committed fraud, and committed a breach of contract." (Doc. 1, #14). The only

21

remaining claim at this point is the RLPHRA one, which the Singletons did not include in their motion to dismiss.

Courts routinely dismiss declaratory judgment claims when the facts underlying the request for declaratory relief have already ripened into a cause of action. *See Putman v. Allstate Ins. Co.*, No. 1:21-cv-14, 2021 WL 1580836, at *3 (S.D. Ohio Apr. 22, 2021) ("Since the adjudication of Putman's breach of contract claim will necessarily decide 'the status of the contractual relationship,' declaratory judgment on the same issue is unnecessary and duplicative."); *Jerome-Duncan, Inc. v. Auto-By-Tel, L.L.C.*, 176 F.3d 904, 908 (6th Cir. 1999).

That rule makes sense, and the Court applies it here. The Buyers' declaratory judgment claim is duplicative of its RLPHRA claim because the Court's adjudication of that claim necessarily will answer the question on which it seeks declaratory relief. Thus, the Court dismisses the separate declaratory judgment claim advancing basically the same argument.

## CONCLUSION

For the reasons discussed above, the Court **GRANTS** Defendants' Partial Motion to Dismiss (Doc. 10). Specifically, the Court **DISMISSES** Count 2 **WITH PREJUDICE**, and Counts 3, 4, and 5 **WITHOUT PREJUDICE**. Beyond that, the Court **DISMISSES WITH PREJUDICE** all claims to the extent they are brought on behalf of the Buyers' minor children.

**SO ORDERED.**

March 31, 2026
 **DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**